Mr. Justice Hodges
delivered the opinion of the Court.
The attorney-respondent, John J. Murphy, is hereby disbarred; his license to practice law in the State of Colorado is revoked; and his name is stricken from the roll of attorneys. He is ordered to forthwith surrender his license to practice law in the State of Colorado to the Clerk of the Supreme Court of Colorado.
On the basis of a report prepared by the Supreme *183 Court Grievance Committee, after the completion of a hearing on the various charges lodged against the respondent by the Attorney General, disbarment was recommended by the Grievance Committee. In this report, the Grievance Committee found that the charges were clearly sustained, and that the evidence presented at the hearing left no doubt that the respondent “was guilty of conduct contrary to the highest standards of honesty, justice and morality” as to all of the nine separate charges set forth in the complaint.
A brief account of the respondent’s professional background, and a summary of his defalcations, which require the sanction of disbarment, are herein set forth. This court, on behalf of the legal profession, imposes this disbarment with regret, not because this respondent is thus punished, but because any attorney should have subjected himself to disbarment by reason of his utter disregard for his attorney’s oath and his solemn obligation to adhere to the highest standards of professional conduct.
The respondent, a resident of Colorado Springs, was on July 15, 1963 duly admitted and licensed by this court to practice law within the State of Colorado. Previously, in 1951, he was admitted to practice law in Massachusetts, and in 1956, he was licensed to practice law in New York. He was associated with two large New York City law firms during his residency in that state.
In 1963, the respondent became a resident of Colorado and also became associated as a member in a Colorado Springs law firm. From 1963 to 1968, various changes in membership took place in this law firm. During this period, the respondent’s withdrawals exceeded by a substantial amount his share of the net income of the law firm. On September 1, 1968, the respondent’s capital account at the law firm showed a deficit balance in excess of $100,000. In accordance with an agreement entered into between all the members of the law firm, it was agreed that this deficit balance should be re *184 duced, and to acomplish this, the respondent agreed to execute, and did execute, two promissory notes payable to the law firm. One of the notes was in the principal sum of $30,000 payable on demand without interest, and the other was in the principal amount of $70,000 payable at the rate of $10,000 annually with the interest at 6% per annum payable quarterly. The report of the Grievance Committee indicates that no showing was made that any payments had been made on these promissory notes.
The facts of the foregoing paragraph reflect significant circumstances concerning the respondent’s financial condition at the inception of the period in 1968, 1969, and 1970 during which he allegedly misappropriated funds and diverted them to his own use. The substantial over-withdrawal from the law firm bank account and the subsequent defalcations in 1968, 1969, and 1970 by the respondent were made possible in some measure by the lack of attention on the part of the senior member of the law firm, who possesses considerable wealth. This senior member’s lack of attention applied not only to the financial activities of the law firm but to the status of his personal checking account from which the respondent improperly drew funds by use of a power of attorney. Respondent by this means enlarged the senior member’s capital credit account in the law firm, thus permitting the respondent to take large advances.
The respondent has filed exceptions to the report and recommendation of the Grievance Committee. The Attorney General has moved to strike these exceptions because the respondent has failed to provide a reporter’s transcript of the testimony before the Grievance Committee to support his exceptions. In accordance with Rule 256 of the Rules of the Supreme Court of the State of Colorado for Discipline of Attorneys, if a respondent files exceptions, he should also provide a reporter’s transcript to enable this court to pass on the exceptions.
In examining the exceptions, it is the view of this *185 court that the respondent should have supplemented the filed exceptions with several portions of the reporter’s transcript of testimony which would have to be examined in order for this court to rule upon his exceptions. Prior to ruling on the Attorney General’s motion to strike the exceptions, the respondent filed an application for voluntary surrender of his license to practice law in the State of Colorado. From the context of this application, it is apparent that the respondent does not intend to pursue the exceptions he made to the report of the Grievance Committee. We therefore consider the exceptions filed by the respondent as withdrawn. Also, we deny the respondent’s application to voluntarily surrender his license to practice law in the State of Colorado. The gravity of the respondent’s wrongful conduct necessitates disbarment.
I.
As to the first charge against the respondent, the Grievance Committee found from the evidence and testimony presented at the hearing that the respondent misappropriated $11,109 from Timber Trends, Inc., a Colorado corporation. This corporation was formed by and represented by members of the law firm. Its only tangible asset was a house in Colorado Springs.
Locom Investments (Locom) was a partnership established and maintained by certain members of the law firm for the purpose of handling investments of the firm. One of Locom’s investments was a stock ownership in Timber Trends, Inc., which was indebted to a bank in Colorado Springs in the sum of $15,000 as evidenced by an unsecured promissory note. It had been signed by the respondent as vice-president of the corporation and he also signed in his individual capacity. Likewise, other members of the law firm signed the note. It had been agreed by the members of the law firm who had signed the note that when the house was sold, the net proceeds would be applied to this note.
The house was sold on March 27, 1970. A check in the *186 amount of $12,239, which represented the net proceeds of the sale, and made payable to Timber Trends, Inc., was delivered to the respondent. He deposited it in the account of Locom at the Exchange National Bank in Colorado Springs. Thereafter, respondent wrote 12 checks amounting to $11,109 on this account which were all payable to himself or to cash. All these checks were dated in April 1970.
On or about May 1, 1970, respondent told the president of the bank holding the $15,000 promissory note of Timber Trends, Inc. that the house was “slow in closing” but that the note would be paid in about two weeks. No part of the sales proceeds, which the respondent diverted to his own use, have been repaid by him. The evidence revealed that these funds came into the hands of the respondent without the knowledge or consent of any member or employee of the law firm.
II.
With respect to the second charge against the respondent, it was found that on March 13, 1969, he wrote a check for $10,000 payable to himself on the law firm trust account. At the time, there was insufficient funds to cover this check in that account. On March 24, 1969, respondent thereupon wrote a check for $10,000 on the senior member’s personal account without his knowledge and consent. He deposited this check in the trust account and the bank thereupon honored his $10,000 check made payable to himself on the trust account. These funds were used by the respondent for his personal use and benefit.
The respondent was able to draw a check on the personal account of the senior member by means of a power of attorney. This instrument had been given to the respondent several years previously. Its purpose, however, was to permit respondent for only a limited time, while the senior member was out of the country, to pay certain obligations from his personal checking account. Further facts about this power of attorney are related *187 in connection with the 7th, 8th and 9th charges later discussed.
III.
The 3rd, 4th and 5th charges against respondent involve the following transactions.
On April 9, 1969, respondent wrote a check payable to himself in the amount of $10,000 on the Locom bank account at Colorado Commercial Bank. There were insufficient funds in that account at this time to cover this check. On April 14, 1969, respondent caused to be delivered to himself by certain corporate trustees three checks representing in each case a partial payment on estate fees due to the law firm. These checks were in the amounts of $3,400, $2,500 and $4,500. The respondent deposited these checks in the Locom checking account to cover the aforementioned $10,000 check which he had written to himself and to cover an additional check for $375, which the respondent wrote to himself dated April 24, 1969.
The Grievance Committee found that the three checks for attorney’s fees in the total amount of $10,400 belonged to the law firm and not to the respondent individually. The respondent did not have the consent or authority of any member of the law firm to obtain these funds and no part of the same has been repaid.
IV.
With respect to the 6th charge, the Grievance Committee found that on June 26, 1969 respondent caused to be delivered to himself, by a certain corporate trustee, a check for $2,000 representing a payment on attorney’s fees due the law firm from a certain estate. On June 30, 1969, respondent endorsed this check and deposited it in the Locom checking account. Thereafter, this money was appropriated by the respondent by checks he wrote on the Locom account.
The Grievance Committee found from the evidence that this $2,000 attorney’s fee belonged to the law firm and not to respondent individually, and that the re *188 spondent did not have the consent or the authority of any member of the firm to obtain these funds for his own use and benefit. No part of this $2,000 fee has been repaid by the respondent.
Y.
The 7th, 8th and 9th charges against the respondent involve his use of the power of attorney which the senior member had several years previously given to him for a limited purpose as previously explained. According to the Grievance Committee’s finding, it was found that the respondent had used this power of attorney regularly from 1964 through 1968 and that apparently, the senior member was unaware of this. The Grievance Committee remarked in its findings that it was concluded from the senior member’s testimony and other testimony at the hearing, that he was so unconcerned about his own financial affairs, that he knew virtually nothing about respondent’s activities with respect to his personal account during this period of time. It appears obvious that the large number of checks which were drawn against the senior member’s personal account and made payable to the law firm and deposited in the law firm’s account represented the continual source of money which enabled the respondent to withdraw far more from the firm each year than his share of the profits.
The foregoing paragraph summarizes the findings and conclusions of the Grievance Committee with regard to the unique situation in existence when the respondent involved himself in the following three defalcations:
On September 12, 1968, the respondent wrote a check on the senior member’s personal account through the use of the power of attorney. This check was made payable to the law firm’s trustee account and was in the amount of $3,000. The check was deposited in the trustee account on September 12, 1968, and on the same date, respondent wrote a check on the trustee account payable to himself for $3,000. These funds were converted to the re *189 spondent’s own use without the knowledge or consent of the senior member.
On March 24, 1969, respondent wrote a check on the senior member’s personal account through the use of the power of attorney in the amount of $10,000. This check was also payable to the law firm’s trustee account. The purpose of this check was to cover the $10,000 check previously written on the trust account as detailed in the second charge against respondent. These funds were converted to the personal use of the respondent without the knowledge or consent of the senior member.
On April 1, 1969, respondent wrote a check on the senior member’s personal account through the use of the power of attorney. This check was payable directly to respondent in the amount of $7,500. The proceeds of this check were applied for the sole use and benefit of respondent without the knowledge or consent of the senior member.
The above-mentioned power of attorney had been executed by the senior member and delivered to his bank on January 23, 1964. It was terminated by him on April 16, 1969, after he learned of the $7,500 check mentioned in the forgoing paragraph.
The Grievance Committee found that although there was some conflict in the testimony concerning the purpose, the scope and the intent of the power of attorney which the senior member had executed in favor of the respondent, it was, nevertheless, clear from the evidence that the respondent had no authority to write the aforementioned three checks and thereby appropriate a sum in the amount of $20,500 to his own use and benefit.
VI.
In conclusion, the Grievance Committee in its report to this court, made the following general findings with reference to the nine charges against the respondent. The respondent’s defense was based mainly upon two propositions; first, that the “overwithdrawals” and “advances” were an established practice of the firm and were at least *190 tacitly permitted or authorized; second, that there was no specific intent on the respondent’s part to permanently misappropriate funds and that he intended to pay back the funds which he had taken.
The Grievance Committee found that the evidence was overwhelmingly contrary to these two defense propositions of the respondent.
From and after September 1968 when new members were added to the law firm, there was a specific understanding and agreement that no further overwithdrawals would be permitted. The respondent knew and agreed to this. All nine charges of the complaint relate to events transpiring after this time.
The respondent’s course of conduct after September 1968 clearly showed his intent to appropriate the funds of others to his own use and such course of conduct continued until he was terminated as a member of the law firm in May of 1970.
The findings and conclusions of the Grievance Committee, which are premised upon a full hearing before that Committee, fully justify the disbarment of this respondent. The Grievance Committee unanimously recommends disbarment. We agree with this recommendation and adopt it.
Accordingly, it is our judgment that the respondent be forthwith disbarred and that his license to practice law in the State of Colorado is hereby revoked. Costs in the amount of $374.16 are herby assessed against the respondent who shall have 90 days to pay these costs at the office of the Clerk of the Supreme Court.